**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

NUTRAQUEST, INC.

                                           Chapter 11
                                           Case No.  03-44147 (RTL)

                 Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - -X
JASON SCHECHTER, et al.,

                                           Adversary Proceeding
                    Plaintiffs,          Case No. 07-1292 (RTL)
             v.
CYTODYNE TECHNOLOGIES,         District Court
LLC, et. al.,                              Civ. No. 06-1726 (GEB)

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**APPEARANCES:**

Joseph DiRienzo, Esq.
DiRienzo & DiRienzo, P.A.
Attorneys for Plaintiffs

Simon Kimmelman, Esq.
Valerie A. Hamilton, Esq.
Sills Cummis & Gross, P.C.
Attorneys for Debtor/Defendant

Brian J. McMahon, Esq.
Anthony M. Gruppuso, Esq.
Gibbons, P.C.
Attorneys for Defendants, Robert Chinery, Jr., Tracy Chinery, RTL Research & Development,
LLC and Kelly Conklin (The "Chinery Defendants")

Ben H. Becker, Esq.
Allen J. Underwood, II, Esq.
Becker Meisel, LLC
Co-Counsel for Defendants, Phoenix Laboratories, Inc., Evergood Products Corporation,
Evermel, LLC, Cytodyne, LLC, Cytodyne I, LLC, Everrich, LLC and Mel Rich (The "Phoenix
Defendants")

Stephen R. Stern, Esq.
Hoffinger Stern & Ross, LLP
Co-Counsel for the Phoenix Defendants

Frances Wang Devaney, Esq.
Philip J. Anderson, Esq.
Marks, O'Neill, O'Brien & Courtney, P.C.
Attorneys for Defendant, Wood Lane Family Pharmacy, Inc.

**RAYMOND T. LYONS, U.S.B.J.**

## INTRODUCTION

At issue is:

1.     Whether the releases and injunctions contained in Nutraquest's Chapter 11 Plan
and Confirmation Order bar claims raised by the Plaintiff, Jason Schechter, in this
adversary proceeding;[1]

2.     Whether the *Markowitz* Class Action Judgment bars claims asserted by Schechter
relating to the advertising and marketing of Xenadrine EFX; and

3.     Whether Schechter's constructive trust claim has been released.

Defendants' main argument is that Schechter's suit is now barred by the release and
injunctions in the Plan and Confirmation Order. By way of introduction, the context of that
argument should be kept in mind.

---

[1] Jason Schechter's parents are co-plaintiffs with *per quod* claims. All references to
Schechter as "Plaintiff" are meant to include all plaintiffs.

At the time of confirmation, Jason Schechter had a pending personal injury suit against the Debtor, Nutraquest, Inc., and numerous other defendants. Progress in his suit had been stymied by the Debtor removing the suit to federal court then seeking postponements while it dealt with other claimants. Since Mr. Schechter's alleged tort occurred while the Debtor was in bankruptcy, his claim is treated as an administrative claim; *i.e.*, first priority along with fees for the professionals retained by the Debtor and the Official Committee of Unsecured Creditors.

The Second Modified Plan, filed by the Debtor on June 1, 2006, along with a disclosure statement approved by the District Court and sent to creditors for balloting or objection, provided that administrative expenses would be paid in full when allowed as required by the *Bankruptcy Code*. As an administrative claimant, Mr. Schechter was not entitled to vote on the Plan and had no cause to object to confirmation of the Plan since it treated his administrative claim consistently with the *Bankruptcy Code*. He filed a timely administrative proof of claim.

All other personal injury plaintiffs with claims against the Debtor and others were different from Mr. Schechter.

- They all alleged their personal injuries were caused by ingesting products sold by the Debtor containing ephedra. The product allegedly ingested by Mr. Schechter was ephedra-free and it is unlikely that the Debtor even sold the product.

- All of the ephedra plaintiffs' cases were subject to intensive case management after being transferred to the District Court. Schechter's case languished without progress.

- All of the ephedra plaintiffs mediated their cases with the Debtor and the other defendants, and all reached agreed values for their claims. Schechter was not

offered mediation.

- All of the ephedra plaintiffs were promised that the Debtor and other defendants would put together a fund to pay the agreed value of their claims in full upon confirmation of a plan of reorganization in the Debtor's bankruptcy case. Schechter was offered nothing – he would have to prove his case then try to collect if he was awarded damages.

- All of the ephedra plaintiffs were put in a separate class in the Plan and entitled to vote to accept or reject the Plan. Schechter was not a member of any class and could not vote.

- Some of the ephedra plaintiffs voted to reject the Plan. Schechter neither voted nor objected to confirmation.

- Intensive negotiations ensued among the ephedra plaintiffs and the Debtor while the confirmation hearings stretched out over August, September, and October 2006 to resolve the ephedra plaintiffs' rejection. Schechter was excluded from all negotiations.

At the last moment the ephedra plaintiffs reached agreements to change their votes to accept the Plan. A Third Modified Plan of Reorganization was presented to the District Court on October 20, 2006, with the representation that the modification did not adversely impact any creditor who had not agreed to the modification in writing. Schechter was not asked to agree to any modifications. Buried in the 408-page Plan, in Article VIII entitled "Ephedra PI Settlement Agreement and Plan Class 3 Escrow", was the insertion of eight words – "any product (including but not limited to any" – before the words "ephedra or ephedra-containing products)" that

4

described the extent of the release granted to non-debtors in the Plan. With all objections to confirmation having been withdrawn and all impaired classes having voted to accept the Plan, the District Court concluded the uncontested confirmation hearing on October 31, 2006, and entered the Confirmation Order on November 3, 2006.

Several months later the Debtor and other defendants moved to dismiss Schechter's suit on the grounds that, *inter alia*, the insertion of the words "any product (including but not limited to any" before the words "ephedra or ephedra-containing products)" in the confirmed Plan eliminated Schechter's administrative claim and his right to pursue his suit against the Debtor and the other defendants. If their argument is accepted, Schechter would receive no payment and be deprived of his right to sue not only the Debtor in bankruptcy but all the other non-debtor defendants, while all other personal injury plaintiffs whose agreed value of their claims (totaling over $30 million) have been paid in full. That result would come about because of a modification to the Plan that the Debtor represented to the District Court did "not adversely change the treatment of the claim of any Creditor who has not accepted the Modification in writing". App. for Approval, ¶ 13, p. 6, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 256, Oct. 20, 2006.

This court concludes that the Debtor should be held to the representation it made to the District Court – that the modifications in the Third Modified Plan do not adversely impact creditors who have not agreed to them in writing. Since Schechter has not agreed to the modifications in the Third Modified Plan they cannot adversely impact him. Therefore, the insertion of "any product (including but not limited to any" before the words "ephedra or ephedra-containing products)" in Section 8.2 of the Plan does not bar Schechter's suit against the Debtor or other defendants.

Additionally, the court finds the *Markowitz* Judgment does not bar Schechter's claims

because the *Markowitz* class "[p]laintiff expressly disclaim[ed] any intent to seek any recovery for personal injuries suffered or which any Class member may suffer." *See Markowitz* Compl. at ¶ 17, Bankr. Ct. Docket No. 03-2980-RTL, Doc. 1-4, at p. 5-22, Dec. 24, 2003; *Markowitz* First Am. Compl. at ¶ 18, Bankr. Ct. Docket No. 03-2980-RTL, Doc. 1-4, at p. 23-35, Dec. 24, 2003; *Markowitz* Second Am. Compl. at ¶ 44, Bankr. Ct. Docket No. 03-2980-RTL, Doc. 1-4, at p. 48-68, Dec. 24, 2003. Therefore, summary judgment is denied on this ground. However, summary judgment is granted as to the constructive trust claim because it was released at confirmation. Defendants have moved to dismiss several other causes of action in Schechter's complaint, but the court declines to decide those issues at this time and instead leaves them to be addressed by the state court on remand.

## **JURISDICTION**

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b),[2] 28 U.S.C. § 157(a), and the order by the United States District Court for the District of New Jersey dated August 20, 2007, referring all pending motions in this adversary proceeding to the Bankruptcy Court.

This is a non-core proceeding under 28 U.S.C. § 157(b). In order for a proceeding to be consider core it must be "arising under" or "arising in" title 11. *See* 28 U.S.C. §157(b)(1) (2007). Additionally, a non-exhaustive list of core proceedings is set forth in 28 U.S.C. §157(b)(2). Proceeding "arising under" or "arising in" title 11 must substantively invoke title 11 or have no existence independent of the bankruptcy case. *See Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006).

---

[2] This court previously ruled that there is no jurisdiction over Plaintiff's claims against the non-debtor Defendants. Bankr. Ct. Docket No. 03-44147-RTL, Doc. 1271, Nov. 3, 2006.

Proceedings that are considered only "related to" a case under title 11 cannot be classified as core. *Id.* at 217. "A proceeding is "related to" a bankruptcy case if 'the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy.' " *Id.* (quoting *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), *overturned on other grounds* by *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)). When determining what could conceivably effect the estate in a post-confirmation cause of action, the Third Circuit explained the focus of the inquiry should be "whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold Bankruptcy Court jurisdiction over the matter." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166-67 (3d Cir. 2004).

Cases involving "the liquidation or estimation of contingent or unliquidated personal injury torts . . . " are excluded from classification as core proceedings. 28 U.S.C. § 157(b)(2)(B) (2007). Schechter's suit stems from the heart attack he suffered after ingesting the Defendants' product; thus, the language of Section 157(b)(2)(B) prevents the case from being a core proceeding.[3]

An argument can be made to the contrary because the court is asked to interpret the confirmed Plan, and confirmation of a plan is a core proceeding. 28 U.S.C. § 157(b)(2)(L) (2007). Similarly, matters concerning the administration of the estate are core proceedings. 28

---

[3] Personal injury claims are also specifically excluded by Section 157(b)(2)(O), which includes as a core proceeding:

> other proceeding affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, *expect personal injury tort or wrongful death claims*.

28 U.S.C. § 157(b)(2)(O) (2007) (emphasis added).

7

U.S.C. § 157(b)(2)(A) (2007).[4] While the court is making a determination regarding the confirmed Plan and administration of the estate, this case is rooted in a claim for personal injuries; therefore, it is more prudent to consider it a non-core proceeding.

Furthermore, this case is distinguishable from the recent Third Circuit opinion, *Geruschat v. Ernst Young LLC (In re Seven Fields Development Corp.)*, No. 06-3658, 2007 U.S. App. LEXIS 24826 (3d Cir. Oct. 24, 2007), which affirmed the findings of both the bankruptcy and district courts, that a suit based on alleged accounting malpractice by a court-approved accounting firm in a bankruptcy case was "arising in" title 11, and thus a core proceeding. *Id.* at *74-75. The court stated:

> In sum, it is clear to us that a malpractice action against an accountant for misconduct during the bankruptcy on which the bankruptcy judge relied in confirming the plan of reorganization, and in reliance on which the bankruptcy court approved the fees to the accountants, and on which appellants' representatives relied to their detriment in selling the assets to pay their claims, in a manner that contravenes the terms of the reorganization plan, constitutes a core proceeding, more specifically a proceeding "arising in" the bankruptcy, which is subject to federal jurisdiction and the final adjudicative authority of the bankruptcy court.

*Id.* While the court in *Seven Fields* points out that the claim at issue arose post-petition but preconfirmation, greater emphasis was placed on the integral role the accounting company played in the bankruptcy proceeding.[5] The court found the " ' alleged malpractice . . . implicated

---

[4] Indeed, in opposing Schechter's motion to remand this proceeding to state court, the Debtor argued that Schechter's case is a core proceeding. *See* Dist. Ct. Docket No. 03:06-cv-1726-GEB, Doc. 7, July 24, 2006.

[5] The court found that:
as a result of the work that Ernst & Young performed during the bankruptcy proceeding and its representation to the bankruptcy court, the bankruptcy court deemed the Debtors to be insolvent. This conclusion led to the formation of Seven Fields, a corporation organized . . . to "achieve the goal of full payment" of the unsecured nondischargeable debt due appellants. Certainly this aspect of the plan . . . was a significant factor in bringing about the court's confirmation . . . .

the integrity of the entire bankruptcy process' and the 'alleged malpractice was inseparable from the bankruptcy context.' " *Id.* at *68 (quoting *In re Resorts Int'l, Inc.*, 372 F.3d at 163). Here, while Schechter's claim also arose post-petition but preconfirmation, his personal injury claim lacks the same type of impact on the bankruptcy case as the malpractice suit at issue in *Seven Fields*. Therefore, Schechter's claim is not a core proceeding.

This proceeding is "related to" the bankruptcy case because the determination of the amount owed, if any, to Schechter will have an effect on the estate. Schechter's alleged tort claim arose post-petition but preconfirmation. It is treated as a priority administration expense entitled to be paid in full under 11 U.S.C. § 1129(a)(9)(A) and Section 3.1 of the Plan. *See Reading v. Brown*, 391 U.S. 471 (1986). Therefore, pursuant to 28 U.S.C. § 157(c), this court may hear this case as a non-core proceeding. The court shall "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c) (2007).

---

*In re Seven Fields*, 2007 U.S. App. LEXIS 24826, at *69.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

### I.    NUTRAQUEST BANKRUPTCY AND GENERAL BACKGROUND[6]

Nutraquest, Inc., sold dietary supplements that promised to help people lose weight. Initially, Nutraquest was very successful financially, realizing millions of dollars in sales and millions of dollars in profits. Nutraquest's most lucrative product was Xenadrine RFA, which contained the ingredient ephedra. In the early 2000s, questions arose regarding the harmful effects of ephedra. A consumer class action case was instituted in California, and in early 2003 a judgment was entered against Nutraquest for approximately $18 million, which Nutraquest appealed.

Subsequently, an onslaught of personal injury suits were filed against Nutraquest and others in the chain of product distribution. In early 2003 a professional baseball player died in spring training; his survivors claimed his death was caused by Xenadrine RFA. The same allegations arose after the death of a college football player during practice. Approximately fifty other ephedra personal injury suits were instituted, as well as other class actions, including one in New Jersey.

On the government level, several states' attorneys general initiated actions against Nutraquest relating to consumer fraud and products advertising. Additionally, the Federal Trade Commission ("FTC") began similar proceedings, the United States Congress held hearings regarding ephedra, and the Food and Drug Administration began investigations.

---

[6]  The background facts are found in the moving papers, as well as the District Court's Findings of Fact included in the Confirmation Order, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 278, Nov. 3, 2006, and the Debtor's Disclosure Statement, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 78, June 1, 2006. Other facts and procedural history have been gleaned from the docket of this case and adversary proceeding in both the District Court and the Bankruptcy Court.  A listing of the docket entries referred to is attached as an appendix.

By early 2003 Nutraquest stopped selling ephedra products but continued to sell other weight-loss dietary supplements. In May 2003 Nutraquest engaged in an asset sale and license transfer (the "Asset Sale"). As a result, a product Nutraquest distributed, Xenadrine EFX, was sold to other companies including Cytodyne Technologies, LLC. Xenadrine EFX is an ephedra-free dietary supplement and weight loss product.

These events, as well as other pressures, were brought to bear on Nutraquest, creating financial strain. Such events lead to Nutraquest filing a voluntary petition under Chapter 11 of the *Bankruptcy Code* on October 16, 2003. Around the same time, another ephedra supplier, Twin Labs, filed bankruptcy and a myriad of ephedra personal injury suits were consolidated in a multi-district litigation in New York.

Nutraquest always was a small, closely held company. Robert Chinery, Jr., was president, director, and one hundred percent shareholder.[7] His wife, Tracy, was the corporate secretary. At the time it filed bankruptcy, Nutraquest had only seven employees and had, essentially, ceased operations after the May 2003 Asset Sale. It had minimal product sales and its projected annual revenue of $5 million consisted primarily of royalties. Monthly Operating Report for November 2003, Bankr. Ct. Docket No. 03-44147-RTL, Doc. 90, Dec. 17, 2003; Verified App. for Order Auth. Debtor to Pay Prepetition Wages, Bankr. Ct. Docket No. 03-44147-RTL, Doc. 16, Oct. 22, 2003. Its balance sheet disclosed assets of only $13 million and liquidated liabilities of $20 million at book value. *See* Monthly Operating Report for November 2003. By the date of the confirmation hearing, October 31, 2006, the assets had shrunken to $8.4 million verses liabilities

---

[7] The information about the operations of Nutraquest were derived from the Debtor's Verified Complaint for Declaratory and Injunctive Relief. Bankr. Ct. Docket No. 03-44147-RTL, Doc. 60, Dec. 3, 2003.

of $15.3 million, not counting the agreed value of ephedra personal injury claims or the class action settlements. Monthly Operating Report for October 2006, Bankr. Ct. Docket No. 03-44147-RTL, Doc. 1297, Dec. 1, 2006.

After filing bankruptcy, Nutraquest sought to deal with the mixed bag of pending litigation. The ephedra personal injury suits were transferred to the United States District Court for the District of New Jersey. The District Court mandated that any personal injury or wrongful death claim filed against Nutraquest be converted into a lawsuit in the District Court, and a bar date was set for prepetition claims. Approximately 390 ephedra personal injury proofs of claim were filed with the Bankruptcy Court. Any ephedra personal injury claim that was filed before the bar date but not converted to a suit in the District Court was expunged after notice to the claimant. That left 173 ephedra personal injury claims to be resolved in the District Court. After extensive case management and commencement of preliminary hearings in bellwether cases, the District Court recommended these claims for mediation, which began in the spring of 2005 and was completed by early 2006. The mediation was conducted with the understanding that if values were agreed upon between the plaintiffs and the defendants, a plan would be structured that would provide substantially full payment for the agreed values of the ephedra personal injury claims. Additionally, the pending class actions, FTC action, and actions by all attorneys general were resolved. A Funding Agreement was reached whereby third parties contributed approximately $48 million to fund the Ephedra Personal Injury Settlement and the class action settlements.

Also in early 2006 the District Court decided to withdraw the reference of the bankruptcy case. The District Court presided over the confirmation proceedings and facilitated the settlements. The court entered a Confirmation Order on November 3, 2006. This Order contained

a broad release from liability for the Defendants.

As to the administrative claims, the Plan fixed a bar date of thirty days after confirmation and provided that administrative claims would be paid in full upon allowance.

## II.   *MARKOWITZ* FACTS AND PROCEDURAL HISTORY

Richard Markowitz filed a class action complaint in January 2003 in the Superior Court of New Jersey asserting consumer fraud, false advertising claims. A First Amended Complaint was filed in May 2003, and a Second Amended Complaint was filed in October 2003. Each of these complaints stated: "Plaintiff expressly disclaims any intent to seek any recovery for personal injuries suffered or which any Class member may suffer." *See Markowitz* Compl. at ¶ 17; *Markowitz* First Am. Compl. at ¶ 18; *Markowitz* Second Am. Compl. at ¶ 44.

Nutraquest filed for bankruptcy on October 16, 2003. Three days after filing bankruptcy, Nutraquest removed *Markowitz* from state court. In January 2004, the Bankruptcy Court denied the class representatives' motion to remand. The reference to the Bankruptcy Court was subsequently withdrawn because the *Markowitz* plaintiffs would not consent to a jury trial in bankruptcy court. 28 U.S.C. § 157(e) (2007). In August 2004 the *Markowitz* class representatives filed a class proof of claim in the *Nutraquest* bankruptcy case. This claim was later modified to a nationwide class claim.

The *Markowitz* Settlement Agreement in principle was reached on February 3, 2006. On May 19, 2006, this agreement was signed and a Third Amended Complaint was filed. Dist. Ct. Docket No. 3:04-cv-00384-GEB, Doc. 43, May 19, 2006. This complaint differed from the prior three complaints in that the language disclaiming intent to seek recovery for personal injury claims through the suit was absent.

The District Court entered an Order on June 2, 2006, preliminarily certifying the classes

13

for settlement purposes, directing issuance of notice, and scheduling a final approval hearing. Then on October 12, 2006, the District Court entered the *Markowitz* Judgment, granting final approval of the settlement and bankruptcy claim.

### III. *SCHECHTER* FACTS AND PROCEDURAL HISTORY

In February 2004 Jason Schechter, the plaintiff in this case, purchased Xenadrine EFX from Wood Lane Family Pharmacy, in Old Bridge, New Jersey. In March 2004 he suffered a cardiac arrhythmia, which he claims was caused by Xenadrine EFX. These events occurred after Nutraquest filed bankruptcy on October 16, 2003.

Schechter initiated his suit on February 17, 2006, in the Superior Court of New Jersey. The case named numerous defendants, including Nutraquest and Cytodyne. Schechter's complaint alleged several claims for recovery: strict products liability, fraud, negligent misrepresentation, violation of the New Jersey Consumer Fraud Act, assault and battery, negligence, medical malpractice, pharmacological malpractice, intentional interference with a property right, and a *per quod* claim.

In April 2006 Nutraquest removed the case to the United States District Court for the District of New Jersey. Schechter filed a motion to remand the case back to state court on May 10, 2006, and Nutraquest objected to the remand motion on July 7, 2006. In August 2006, the District Court referred the motion to the Bankruptcy Court. On November 13, 2006, the Bankruptcy Court entered an order granting the motion and remanding the case to the state court. The Defendants appealed, and on December 14, 2006, the District Court stayed the Bankruptcy Court's order pending appeal.

In the meantime Schechter filed a claim for approximately $10 million as an administrative expense for his personal injuries, to which the Debtor objected. On March 9,

2007, the District Court entered an order sending the remand motion back to the Bankruptcy

Court for further consideration because certain arguments were advanced by the Defendants on

appeal that had not been made to the Bankruptcy Court. In light of the intervening confirmation

of the Plan and the *Markowitz* Settlement, the Bankruptcy Court entered an order denying the

remand motion on June 8, 2007. The Defendants filed motions to dismiss Schechter's complaint

on July 27, 2007, in the District Court. On August 20, 2007, the District Court entered an order

referring all pending motions to the Bankruptcy Court.

## DISCUSSION

I.   PROCEDURAL ISSUE

    *A.   12(b)(6) Motion to Dismiss Standard*

Under *Federal Rule of Civil Procedure 12(b)(6)*, a motion to dismiss a complaint may be

granted "for failure of the pleading to state a claim upon which relief can be granted." FED. R.

CIV. P. 12(b)(6). A motion to dismiss allows a defendant to challenge the validity of a complaint.

*Sterling v. Se. Pa. Transp. Auth.*, 897 F. Supp. 893, 895 (E.D. Pa. 1995).

A pleading is deemed sufficient if it contains "a short and plain statement of the claim

showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  "Specific facts are not

necessary; the statement need only ' 'give the defendant fair notice of what the . . . claim is and

the grounds upon which it rests.' ' " *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (quoting *Conley v. Gibson*, 335

U.S. 41, 47 (1957))). "[A] judge must accept as true all the factual allegations contained in the

complaint." *Id.* (quoting *Twombly*, 127 S. Ct. at 1965). To determine whether this requirement is

met, the court must decide whether the complaint plead "enough facts to state a claim to relief

that is plausible on its face." *Twombly*, 127 S. Ct. at 1974. This requires the plaintiff to do more

than provide "a formulaic recitation of the elements of a cause of action." *Id.* at 1965. In order to meet the standard, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

All well-pleaded allegations must be accepted by the court as true and should be viewed in the light most favorable to the non-moving party. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). The burden falls on the moving party to show no claim was presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In making a determination, the court may consider all facts in the pleadings, exhibits, and matters of judicial notice, such as public records. *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

### B.      Conversion of 12(b)(6) Motion to Dismiss to Summary Judgment

*Federal Rule of Civil Procedure 12(b)(6)* states "[if] matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b)(6). Therefore, if the moving party in its motion to dismiss presents or uses materials not contained in the four corners of the plaintiff's complaint, and the court chooses to rely on such materials, the summary judgment standard should be used. *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 606 n.4 (D.N.J. 2002). Such a determination is left to the discretion of the court, but the parties must be given adequate notice of the conversion. *Id.*

Here, the Defendants' motions to dismiss rely heavily on provisions contained in the Plan, Confirmation Order, and *Markowitz* Settlement and Judgment. Such documents, while

16

relevant to the position raised by the Defendants, are separate and apart from the personal injury suit instituted by Schechter. Schechter did not mention these documents, and no other sound argument exists for characterizing the documents as matters within the pleadings.[8]

Therefore, since the Defendants relied on additional documents outside of the pleadings, and the court used these documents in formulating its decision, a conversion of the motion to dismiss to summary judgment is appropriate. The parties were notified that the court would treat this as a motion for summary judgment and invited to make additional submissions.

### C.    Summary Judgment Standard

A court may grant summary judgment under *Federal Rule of Civil Procedure 56(c)* "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[8] A conversion to summary judgment is not warranted when the matter at issue is "a 'document integral to or explicitly relied upon in the complaint . . . .' " *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). Additionally, the court "may take judicial notice of matters of public record outside the pleadings" without converting a motion to dismiss. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). Neither of these exceptions is applicable in the current case. Contrary to arguments made by the Defendants, the documents are not considered public records. The Third Circuit defines a public record to include "criminal case dispositions . . . letter decisions of government agencies . . . and published reports of administrative bodies." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993). Here, the documents at issue are the Chapter 11 Plan, Confirmation Order, and provisions from the *Markowitz* Settlement and Judgment. While Defendants claim these documents are part of the record of prior official proceedings, this assertion neglects to take into account that the Third Circuit previously found "a court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment." *S. Cross Overseas Agencies, Inc. v. Transp. Int'l Pool Inc.*, 181 F.3d 410, 427 n.7 (3d Cir. 1999) (citing *Kauffman v. Moss*, 420 F.2d 1270, 1274-75 (3d Cir. 1970)). Since the Defendants' reliance on these documents would require the court to do just that, the motion must be converted.

party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c).

The moving party bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this showing is made, the burden shifts to the nonmoving party to set forth specific facts and make an affirmative showing that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence produced must be of sufficient quantum and quality to allow a rational and fair-minded fact finder to return a verdict in favor of the nonmovant. *Id.* at 253-54. All justifiable inferences should be drawn in favor of the nonmoving party. *Id.* at 255.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. However, summary judgment is considered a drastic remedy and should not be granted where any doubt exists as to the facts of the case. *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir. 1984).

Here, the facts are not in dispute. To determine this motion as it relates to prior proceedings in federal court, this court must interpret the Plan, Confirmation Order, and *Markowitz* Class Action Judgment. Context has been provided by reviewing the docket entries in the District Court and Bankruptcy Court. Once all federal issues have been decided, any remaining issues in Schechter's suit should be remanded back to state court for resolution of state law issues, and trial if appropriate.

## II.    *MARKOWITZ* JUDGMENT

The issue regarding the *Markowitz* Class Action Judgment arises because the *Markowitz*

18

class plaintiffs asserted consumer fraud, false advertising type claims but specifically excluded personal injuries. Schechter has plead personal injuries allegedly suffered on account of consumer fraud, false advertising types of wrongful conduct. So the question is: Does the *Markowitz* Class Action Judgment preclude all consumer fraud, false advertising causes of action no matter the type of injury alleged? Or, are personal injury claims excluded from the *Markowitz* Class Action Judgment no matter the theory of liability alleged? The court concludes that the exclusion of personal injury claims from the *Markowitz* Class Action Judgment allows Schechter to assert personal injuries based on consumer fraud, false advertising type of alleged wrongful conduct. His personal injury claims are not barred by the *Markowitz* Class Action Judgment.

### A.    Exclusion of Personal Injury Claims

From its inception, the *Markowitz* Class Action excluded personal injuries.[9] The complaint filed in state court in January 2003 states: "Plaintiff expressly disclaims any intent to seek recovery for personal injuries suffered or which any Class member may suffer." *Markowitz* Compl. at ¶ 17. The Defendants have conceded in their briefs that personal injuries are excluded from the *Markowitz* Class Action.[10]

---

[9]  The reason *Markowitz* excluded personal injuries has not been articulated. The Advisory Committee Notes to the 1966 Amendment to *Rule 23* states that personal injury claims by numerous individuals are ordinarily not appropriate for a class action because issues of damages, liability and defenses affect individuals in different ways.  See *Amchem Products v. Windsor*, 521 U.S. 591, 622-25 (1997); 5 ALBA CONTE & HERBERT NEWBERG, *Newberg on Class Actions* §§17.1-17.2 (4th ed. 2002).

[10]  The *Markowitz* class plaintiffs filed a First Amended Complaint in state court in May 2003 and a Second Amended Complaint in state court in October 2003.  Each contained the same exclusion for personal injury claims. *See Markowitz* First Am. Compl. at ¶ 18; *Markowitz* Second Am. Compl. at ¶ 44. Coincident with the negotiation of the Markowitz Class Action Settlement, the *Markowitz* class plaintiffs filed a Third Amended Complaint in the District Court

### B.     Schechter's Injuries

Each count of Schechter's complaint, except the *per quod* count, contains similar

allegations of injury attributed to the alleged wrongful conduct:

> As a direct and consequent  result . . . plaintiff Jason Schechter
> sustained severe and permanent injuries of a temporary and permanent
> nature, both physical and emotional; suffered an aggravation,
> exacerbation and acceleration of prior injuries and/or condition; was
> caused to endure pain, incurred medical expenses and may in the future
> incur additional medical expenses; was prevented from attending his
> normal activities and duties; lost time from his employment and the
> resultant lost wages; suffered a loss of future earnings potential, the loss
> of a chance and employability; suffered a diminution of the quality of
> life; and was otherwise injured.

*See, e.g.*, *Schechter* First Am. Compl., Fourth Count, at ¶ 3, Dist. Ct. Docket No. 03:06-cv-1726-

GEB, Doc. 37-2, June 6, 2007. Whether it be due to product liability or consumer fraud,

Schechter claims personal injuries.

### C.     *Markowitz* Class Action Judgment

The *Markowitz* Class Action Judgment releases claims "that in any way whatsoever (a)

relate to or arise from the subject matter of the Markowitz Action and/or any of the acts or

omissions that were or could have been alleged therein, or (b) relate to or arise form the

advertising, marketing, labeling, promotion, distribution, and/or sale of either *Xenadrine RFA-1*

or *Xenadrine EFX*." *Markowitz* Judgment, p. 8-9, ¶ 12(b), Dist. Ct. Docket No. 3:04-cv-00384

-GEB, Doc. 63, Oct. 12, 2006. The *Markowitz* Class Action Judgment also enjoins prosecution

of released claims by all Class Members. This bar prevents "any law suit, claim, demand, or

proceeding in any jurisdiction that is based on or related to the Released Claims, or the facts and

_____

on May 19, 2006, expanding the class nationwide. The exclusionary language for personal
injuries was not contained in the last pleading.

circumstances related thereto, or the Markowitz Action or the Markowitz Bankruptcy Claims." *Markowitz* Judgment, p. 11, ¶ 13.

Does the release in the *Markowitz* Class Action Judgment preclude Schechter from seeking recovery for personal injuries allegedly caused by the types of claims described in the release? The answer is found in the language of the exclusion in the *Markowitz* class plaintiffs' complaint – "recovery for personal injuries". It is the type of injury that is excluded from the *Markowitz* Class Action Judgment, not the theory of liability. Schechter may seek to recover for personal injuries because that type of recovery has been disclaimed by the *Markowitz* class plaintiffs from the inception of their suit.[11]

Defendants contend that state law does not permit recovery for personal injuries on account of consumer fraud, false advertising type claims. Schechter maintains otherwise. This court declines to decide that issue, leaving it for the state court following remand.

It does not appear Schechter has sought damages for the purchase price of Xenadrine EFX or other injuries common to the members of the *Markowitz* Class Action Judgment.[12]

---

[11] The multitude of personal injury suits filed against Nutraquest were a major cause of the company's dire financial straits. As explained above in the extensive factual and procedural background, the personal injury suits resulted in their own separate settlements. Schechter's claims arose from a heart attack he suffered, allegedly caused by ingesting Xenadrine EFX, making it exactly the type of injury disclaimed in *Markowitz*.

[12] The *Markowitz* Settlement covers two classes of individual. The RFA Class is made up of individuals who purchased Xenadrine RFA-1 in the United States from April 21, 1997 to April 1, 2003, with some limited exceptions. *Markowitz* Judgment, p. 3, ¶ 4. The EFX Class includes individuals who purchased Xenadrine EFX from February 1, 2002 to May 22, 2006. *Markowitz* Judgment, p. 4, ¶ 4. For both classes, common questions exist relating to fraud in advertising, misrepresentations, and violations of consumer protection laws. The settlement applies to both classes and permanently bars a wide range of claims relating to the common questions. The RFA Fund provides each plaintiff with a payment of $11.88. The EFX Fund, administered by the FTC, allows each plaintiff a refund of the cost of one bottle of the product –

21

However, Schechter would be barred from asserting such consumer fraud claims without a personal injury basis as these claims are relegated to the procedure detailed in the *Markowitz* Class Action Settlement and Judgment.

Since the *Markowitz* Judgment does not release the Defendants from liability for personal injury claims, Schechter's claims cannot be barred on this ground. Therefore, summary judgment should be denied.

## III.    PLAN AND CONFIRMATION ORDER

### A.    Scope of Release

The Plan and Confirmation Order do not release the Defendants from Schechter's claims. The pertinent release was limited to ephedra products until a change in language was inserted at the last minute, without agreement by Schechter, to change the release to "any product (including but not limited to" ephedra products. The Debtor represented to the District Court that the last minute modifications to the Plan did not adversely impact anyone who had not agreed in writing. The court interprets this provision as not meant to apply to Schechter since he has not agreed to the modification.

When interpreting a plan, general principles of contract interpretation apply. *In re Sims*,

---

resulting in a refund of less than $50.00.
        Thus, the compensation available under the *Markowitz* Judgment is very limited. To find this type of restrictive settlement applies to Schechter's personal injury claim would be nonsensical and inconsistent with the treatment of other personal injury claims in the case. Schechter is seeking damages for a large sum of money as compensation for personal injuries he suffered. His administrative proofs of claim in the case are for over $10 million. It makes no sense that his claim would be reduced and restricted to the same treatment as other non-personal injury claims. Such a finding would allow him to recover only the costs of the product when other personal injury claimants received the full value of their claims.

358 B.R. 217, 223 (Bankr. E.D. Pa. 2006). *See also In re Buckhead America Corp.*, 180 B.R. 83, 89 n.9 (Bankr. D. Del. 1995) (analogizing reorganization plans and confirmation orders to contracts); *In re L & V Realty Corp.*, 76 B.R. 35, 37 (Bankr. E.D.N.Y. 1987) ("In many respects a plan is in the nature of a contract . . . disputed provisions should be interpreted in light of general contract principles . . . .").[13] "The principle goal of contract interpretation is to 'ascertain and effectuate the objectively manifested intentions of the contracting parties.' " *Heffron v. Adamar of N.J., Inc.*, 270 F. Supp. 2d 562, 570 (D.N.J. 2003) (quoting *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999)). As a threshold question of law, the court must determine if the language of the contract is clear or ambiguous. *Id.*

Contractual language is considered unambiguous if it conveys a distinct idea and is not capable of more than one reasonable interpretations. *See id.*; *In re L & V Realty Corp.*, 76 B.R. at

---

[13] In an unreported decision, the United States District Court for the Southern District of Indiana provided a detailed discussion of why a confirmation plan should be interpreted as a contract. In *In re Heartland Steel, Inc.*, the court stated:

> The Seventh Circuit has explained that "[a] confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002). The provisions of a confirmed plan bind the debtor and creditors in the same manner as a contract. *See In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000); *Envirodyne Indus., Inc. v. Viskase Corp.*, 183 B.R. 812, 818 (N.D. Ill.1995). There is no doubt that the principles of contract construction apply to confirmed plans, and that contract principles apply to the essential terms of a confirmed plan. *See In re Penrod*, 169 B.R. 910, 917 (N.D. Ind.1994), aff'd, 50 F.3d 459 (7th Cir.1995); *UNR Indus., Inc. v. Bloomington Factory Workers*, 173 B.R. 149, 157 (N.D. Ind.1994). A bankruptcy plan "bears close analogy" to a private contract, in the sense that it is created by offer, acceptance and negotiations. *UNR Indus., Inc.*, 173 B.R. at 157 (citing *In re L & v. Realty Corp.*, 76 B.R. 35, 37 (E.D.N.Y.1987)). However, a plan of reorganization also has been viewed as a consent decree or agreed order. *See id.* The Seventh Circuit has recognized that a confirmed bankruptcy plan "acts more or less like a court-approved contract or consent decree." *In re Harvey*, 213 F.3d at 321.

IP 02-1252-C-M/F, 2003 WL 21508233, *3 (S.D. Ind. June 26, 2003). The court continued this discussion later in the opinion stating: "A confirmed bankruptcy plan of reorganization is neither a mere contract, nor a court order. It is its own animal–a contract between the debtor and creditors that is made effective and binding by the bankruptcy court's confirmation order." *Id.* at *4.

37. Generally, when the meaning of a provision is clear, " 'there is no occasion to resort to other means of interpretation. Effect must be given to the intent as indicated by the language employed.' " *Id.* (quoting *W. Union Tel. Co. v. Am. Commc'ns Ass'n*, 299 86 N.E.2d 162, 166 (N.Y. 1949)).

However, the Third Circuit has adopted a more pragmatic approach to interpretation whereby " 'the court is [not] confined to the four corners of the written document; rather, the court must read the contract in the context in which it was made.' " *Heffron*, 270 F. Supp. 2d at 570 (quoting *Pacitti*, 193 F.3d at 773). Thus, the court should interpret terms " ' in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning.' " *In re Sims*, 358 B.R. at 224 (quoting RICHARD A. LORD, 11 WILLISTON ON CONTRACTS §§ 30:4, :7 (West 2006)).

The Bankruptcy Court for the Eastern District of Pennsylvania explained that when a confirmed plan references a settlement agreement or other document, " 'it is always permissible to examine all of them together in aid of the interpretation of the particular terms; and if it is found that the ambiguous words have a plain meaning by comparison of the several contracts and an examination of their provision, that meaning should be attributed to them.' " *Id.* (quoting LORD, *supra*, at § 30:2). Thus, it is proper for the court to take into account the facts and circumstances giving rise to the settlement agreement in order to determine the intentions of the parties. *Id.*

As the Third Circuit instructed in *Pacitti*, extrinsic evidence of intent may be offered. This court notified the parties that it would treat the Defendants' motions to dismiss as motions for summary judgment and offered them an opportunity to make additional submissions. No one

24

offered any testimony, by affidavit or otherwise, regarding intent. Besides the Plan and

Confirmation Order, the court has considered the orders, pleadings, transcripts, and other items

on the docket in the District Court in order to learn the context and discern the intent and

meaning of the Third Modified Plan.

Here, the Defendants argue the Confirmation Order entirely adopts the Plan and in doing

so incorporates Section 8.2 of the Plan. This assertion is supported by language in the

Confirmation Order,[14] as well as the explicit incorporation of Article 8.2 in Section 8.3 of the

Order.[15]

Article VIII of the Plan is entitled "Ephedra PI Settlement Agreement and Plan Class 3

Escrow", Third Mod. Plan, Art. VIII, p. 20, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc.

260, Oct. 24. 2006. The Ephedra PI Settlement was a result of the mediation of ephedra-based

personal injury claims. Under the Settlement Agreement, the plaintiffs are collectively referred

---

[14] The following provisions support the assertion that the Confirmation Order incorporates the Plan: "The terms of the Plan . . . are incorporated by reference into and [is] an integral part of  . . . this Confirmation Order." Conf. Order, p. 37-38, ¶ 86, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 278, Nov. 3, 2006; "The failure to specifically include any particular provision of the Plan in this Confirmation Order will not diminish the effectiveness of such provisions, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference." Conf. Order, p. 54, ¶ 112.

[15] The Confirmation Order states:
The entry of this Order will act as a full and complete discharge of all liens, Claims, debts and liabilities arising from, relating to, or in connection with all Causes or Actions and/or Claims against the Debtor . . . that are released pursuant to Section 8.2 of the Plan or that arise out of or relate to the actions or operations of the Debtor and/or the ingestion or use of any product designed, formulated, marketed, distributed or sold by or on behalf of the Debtor . . . . The releases referred to and described in Section 8.2 of the Plan . . . are fully effective as provided in Article VIII of the Plans.
Conf. Order, p. 43, ¶ 99.

to as the "Settled Ephedra PI Claim",[16] while the funders of the settlement are Nutraquest and

other settling third parties. Under the Agreement and Plan, all Settled Ephedra PI Claims are

paid one hundred percent of their agreed value. *See* Third Mod. Plan, Section 4.3, p. 14. The

Ephedra PI Settlement Agreement did not provide any means of recovery for personal injury

claims that did not go through the mediation process.

Section 8.2 of the Plan is labeled "Release of Ephedra Released Persons"[17] and contains

language expressly limiting liability:

> In consideration of the Ephedra PI Settlement Agreement . . . all Entities
> who have held, hold or may hold Claims . . . shall fully, finally, and
> irrevocably release . . . the Debtor . . . of and from any and all past,
> present and future claims . . . arising from or relating to the design,
> formulation, manufacture, marketing, sale, distribution, fabrication,
> labeling, advertising, supply, production, use or ingestion of any product
> ***(including but not limited to any ephedra or ephedra-containing
> product)*** designed, formulated, manufactured, marketed, sold,
> distributed, fabricated, labeled, advertised, supplied or produced by the
> Debtor . . ."

Third Mod. Plan, Section 8.2, p. 21 (emphasis added). Defendants argue this language is broad

enough to act as a release for both ephedra and non-ephedra-containing products. Therefore,

---

[16] "Settled Ephedra PI Claims" is defined in the Plan as those claims "which have been successfully mediated to resolution pursuant one or more Orders." Third Mod. Plan, Section 1.82, p. 12.

[17] "Ephedra Released Person" is defined as "each Entity identified as a Releasee pursuant to paragraph 1 of the Ephedra PI Settlement Agreement." Third Mod. Plan, Section 1.36, p. 5; Conf. Order, note 2. Paragraph 1 of the Ephedra PI Settlement Agreement defines "Releasees" as:

> the Debtor, the Settling Third Parties and . . . all of their representatives, predecessors, direct and indirect parent companies, subsidiaries and affiliates, along with the franchisees, . . . retailers, officers, directors, employees . . . and any person or entity claimed to be liable derivatively through any of the foregoing . . . ."

Ephedra PI Settlement Agreement, ¶ 1, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 260-2, Oct. 24, 2006.

Defendants argue Schechter's claims are barred because he alleges his injuries arose from

Xenadrine EFX, a non-ephedra containing product.

While this isolated language appears to support the Defendants' assertion, a closer look at

the circumstances surrounding the provision paints a different picture. The aforementioned

language releasing both ephedra and non-ephedra related claims did not appear in its final form

until the Third Modified Plan. In the original Plan filed on February 17, 2006, and the First

Modified Plan filed on April 24, 2006, the provision stated it was a release for "ephedra or

ephedra-containing products." *See* Plan, Sec. 8.2, p. 16, Dist. Ct. Docket No. 03:06-cv-00202-

GEB, Doc. 8, Feb. 17, 2006; First Mod. Plan, Sec. 8.2, p. 21, Dist. Ct. Docket No. 03:06-cv-

00202-GEB, Doc. 21-2, Apr. 26, 2006. Likewise, the Second Modified Plan, filed June 1, 2006,

contained the same language. *See* Second Mod. Plan, Sec. 8.2, p. 21, Dist. Ct. Docket No. 03:06-

cv-00202-GEB, Doc. 74, June 1, 2006. The Disclosure Statement accompanying the Second

Modified Plan was approved by the District Court and sent to creditors for balloting or

objections to confirmation. The present permutation (broadening the release beyond ephedra

products) did not appear until the Third Modified Plan was filed on October 24, 2006. *See* Third

Mod. Plan, Section 8.2, p. 21, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 260, Oct. 24,

2006. Both the confirmation hearing, held on October 31, 2006, and the Confirmation Order,

issued on November 3, 2006, Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 278, Nov. 3,

2006, occurred just days after this alteration.

Up until the confirmation hearing the release in Article VIII, Section 8.2 only applied to

ephedra-related products. Schechter ingested an ephedra-free product. Thus, it was clear that the

Plan did not deprive Schechter of his pending suit. At the time of the modification of the Plan,

27

Schechter was not a party to the compromise that resulted in the ephedra plaintiffs changing their

vote to accept the Plan. Nutraquest's Application for Approval of Modifications, filed on

October 20, 2006, makes clear the compromise reached was the catalyst for the change. The

Application for Approval states:

> The releases contained in Section 8.2 of Plan have been modified
> to make clear that the considerations provided under the Ephedra
> PI Settlement Agreement . . . is ***in exchange*** for a general release
> with respect to the Debtor's operations and products, which is co-
> extensive with injunctions set forth in Section 8.3 of the Plan[.]

App. for Approval, ¶ 11(c), p. 5 (emphasis added), Dist. Ct. Docket No. 03:06-cv-00202-GEB,

Doc. 256, Oct. 20, 2006. This language shows the general release contained in Section 8.2 is the

result of a compromise arising from the settlement of litigation relating to *ephedra containing*

*products*. Furthermore, Nutraquest made multiple representation in its Application for Approval

that the modifications to the Plan would not have an adverse impact:

- The Debtor submits that since the Modifications are largely the result of
  negotiations between the Debtor, its Creditors and certain other parties in interest
  affected thereby, the Modifications are consensual and, in any event, ***do not
  adversely change*** the treatment of the claim of any Creditor who has not accepted
  the Modifications in writing. App. for Approval, ¶ 13, p. 6 (emphasis added).


- Pursuant to Bankruptcy Rule 3019, if the Court finds after hearing on such notice
  as it deems appropriate, that the proposed plan modifications ***do not adversely
  change the treatment*** of the claim of any creditor who has not accepted in writing
  the modifications, they shall be deemed accepted by all creditors who have
  previously accepted the plan. App. for Approval, ¶ 15, p. 7 (emphasis added)
  (internal citations omitted).


- ***Since the Modifications do not adversely change the treatment of the Claim of***

*any Creditor*, within the meaning of Bankruptcy Rule 3019,[18] the Modifications should be deemed accepted by all impaired Creditors who have previously accepted the Second Modified Plan. App. for Approval, ¶ 16, p. 7 (emphasis added).

Indeed, the Order Approving Modification to Debtor's Second Modified Chapter 11 Plan of Reorganization Pursuant to 11 U.S.C. § 1127(a), entered by the District Court on October 27, 2006, specifically states: "and the Court having found that the Modifications do not adversely change the treatment of the claim of any Creditor who has not accepted in writing the Modification." *See* Dist. Ct. Docket No. 03:06-cv-00202-GEB, Doc. 265, Oct. 27, 2006. These provisions lend further support to the conclusion that Schechter was not meant to be included by the release in Section 8.2 because if the release was applied in the manner suggested by the Defendants it would surely have an adverse impact on Schechter.

Despite the language found in the Article VIII injunction,[19] when the circumstances, Settlement Agreement, Plan, and Confirmation Order are considered together, the plain meaning of the provision relied on by the Defendants cannot act as a release for Schechter's claims.

---

[18] The *Federal Rules of Bankruptcy Procedure* states, in relevant part: "If the court finds after hearing on notice . . . that the proposed modification does not adversely change the treatment of the claim of any creditor . . . who has not accepted in writing the modification, it shall be deemed accepted by all creditors . . . who have previously accepted the plan." FED. R. BANKR. P. 3019.

[19] Section 8.3(a) of the Plan provides:
All Entities who have held, hold, or may hold Claims and/or Causes of action against the Debtor and/or any Ephedra Released Person . . . are permanently enjoined . . . with respect to all Causes of Action and/or Claims against the Debtor and/or any of the Ephedra Released Persons that are released pursuant to Section 8.2 above, or that arise out of or relate to the actions or operations of the Debtor and/or the ingestion or use of any product designed, formulated, marketed, distributed or sold by or on behalf of the Debtor . . . .
Third Mod. Plan, Sec. 8.3(a), p. 21-22.

### B.      Due Process

At oral argument on these motions to dismiss Schechter's complaint, counsel for Chinery argued that his client contributed millions of dollars to the reorganization in order to buy global peace. According to his lawyer, Chinery expected all of his personal responsibility for Nutraquest's operations to be over. Regarding Schechter's suit, Chinery's counsel argued that Schechter's lawyer had been given a black-lined copy of the Third Modified Plan in court and had a chance to read it. He could have seen the seven-word change in Article VIII (dealing with the Ephedra PI Plaintiffs in Class 3) and realized that the release could be construed to bar Schechter's suit without compensation. Chinery's counsel asserted that this modification of the plan language and delivery to Schechter's lawyer provided Schechter with due process that his rights would be wiped away, and Chinery's counsel disclaimed any responsibility to give explicit notice to Schechter that his rights were adversely impacted by the Third Modified Plan. Failure of Schechter to object to the changes in the Third Modified Plan should bind Schechter and release the Defendants from having to defend Schechter's suit, says Chinery's lawyer. The Debtor makes a similar argument in its letter brief in support of its motion to dismiss. Schechter disagrees.

It may be that Mr. Chinery could buy peace with the stroke of a pen in his checkbook, but it hardly seems correct that Schechter's rights could be eliminated by the stroke of a pen in the Third Modified Plan without more formal notice and an opportunity to object. Allowing the release to apply so broadly raises due process concerns. The Due Process Clause of the Fifth Amendment to the United States Constitution guarantees no one shall be deprived of "life, liberty, or property, without due process of law." U.S. CONST. amend.V.  "Due process requires

30

'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Folger Adam Sec. Inc. v. DeMatteis/MacGregor J.V.,* 209 F.3d 252, 265 (3d Cir. 2000) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). As discussed, the only notice Schechter received that his rights would be materially affected by the modification was the delivery of a black-lined copy of the Third Modified Plan to his attorney in court during the confirmation hearing. If the release were to function as the Defendants claim, the violation of Schechter's right to notice and a hearing would certainly be an issue.

Nevertheless, the court need not decide whether Schechter's due process rights were violated. Since the court concludes that the release and injunction in the Plan and Confirmation Order do not bar Schechter's suit, his due process rights are not at issue.

### C.    Validity of Non-Debtor Release

Schechter argues that a release of his suit against the non-debtor Defendants would be impermissible under the Third Circuit decision *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000). In that case, the court, while declining to establish "the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible" *Id.* at 213-14, held that the releases of directors and officers in that case "does not pass muster under even the most flexible tests for the validity of non-debtor release." *Id*. at 214. One of the criteria established by other courts for non-debtor releases is they must be fair. The Third Circuit commented: "[T]he District Court did not discuss whether the release and permanent injunction were fair to Plaintiffs and were given in exchange for reasonable consideration." *Id.* at 215. On this basis alone, the Third Circuit held that the release

31

of non-debtors in *Continental Airlines* was invalid. *Id.*

Schechter likens his situation to that of the plaintiffs in *Continental Airlines*. He has been offered no consideration for the deprivation of his pending lawsuit. On this basis alone, the non-debtor releases cannot stand under the Third Circuit's decision in *Continental Airlines*. While his argument has merit, and may have been persuasive at the confirmation hearing, it was not raised nor considered because no one contemplated that the non-debtor releases would bar Schechter. This court need not consider whether the non-debtor releases in the *Nutraquest* Plan are valid under *Continental Airlines* because the court concludes that Schechter's suit against the non-debtor Defendants is not barred.

For a myriad of reasons, the modification in the Third Modified Plan cannot lead to the result claimed by the Defendants:

- Schechter's personal injury suit was pending at the time of the modification, and he was represented by counsel.

- Debtor's Chapter 11 Plan of Reorganization dated February 16, 2006, did not release Schechter's suit.  (Defendants concede this.)

- Debtor's First Modified Chapter 11 Plan of Reorganization dated April 24, 2006, did not release Schechter's suit.  (Defendants concede this.)

- Debtor's Second Modified Chapter 11 Plan of Reorganization dated June 1, 2006, did not release Schechter's suit.  (Defendants concede this.)

- The Disclosure Statement approved by the District Court on June 1, 2006, described the Debtor's Second Modified Chapter 11 Plan of Reorganization.

Schechter was not adversely impacted.

- The District Court fixed July 28, 2006, as the date to file ballots and objections to confirmation. As of that date, the Plan did not release Schechter's suit, so he had no reason to object to confirmation. Also, as an administrative claimant, he was not classified and had no right to vote.

- Debtor's Third Modified Chapter 11 Plan of Reorganization added the words "any product (including but not limited to" before the words "ephedra or ephedra-containing products)" to Section 8.2 in Article VIII of the Plan entitled "Ephedra PI Settlement and Plan Class 3 Escrow."  Third Mod. Plan, Section 8.2, p. 20-21. The title of the Article suggests it does not apply to Schechter since he did not ingest an ephedra product and was not a member of Class 3.

- The changes in the Third Modified Plan resulted from negotiations among the Debtor, the Plan Funders, and those creditors that voted to reject the Plan or had objected to confirmation. Schechter was not included in any negotiations.

- The Debtor represented, and the District Court found, that the Third Modified Plan did not adversely impact any creditor who had not agreed in writing to the modifications.  Schechter did not agree to the modifications.

- All other personal injury plaintiffs have been paid one hundred percent of the agreed value of their claims.  Schechter has been paid nothing.

- The Third Modified Plan came just days before the confirmation hearing concluded.

Therefore, the Plan and Confirmation Order do not release the Defendants from Schechter's suits.

### D.      Channeling Injunctions

The Confirmation Order contains three channeling injunctions: the first pursuant to the Ephedra PI Settlement, the second pursuant to the *Markowitz* Class Action Settlement, and the third pursuant to the *Park* Class Action Settlement. A review of the District Court's Findings of Fact and Conclusions of Law in the Confirmation Order supports the conclusion that the release and injunctions were not meant to terminate Schechter's suit with neither a decision on the merits nor payment. The District Court found that the rational for issuing channeling injunctions was best expressed in *Master Mortgage Inv. Fund Inc.,* 168 B.R. 930 (Bankr. W.D. Mo. 1994). Among the factors cited by the District Court were:

> the non-debtor has contributed substantial assets to the reorganization;[20] and
>
> the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

Conf. Order, p. 34-35, ¶ 78(b), (e).

In this case, the non-debtors committed to contribute up to $47 million to funds for creditors, $30 million to the Ephedra PI Settlement and $17 million to the class action settlements. Conf. Order p. 18, ¶¶ 27, 29; p. 20-21, ¶ 38; p. 30, ¶ 70; p.30-31, ¶ 71; p. 36-37, ¶

---

[20] The benefits of reorganizing a large enterprise such as Johns Manville or AH Robbins to preserve thousands of jobs and going concern value may underlie the decisions approving channeling injunctions. Nutraquest, by contrast, employed only seven people and sold off its main product line before entering bankruptcy. "Reorganization" may not be the best term to describe what happened to Nutraquest.

83. The District Court found that: "The Plan provides for the payment of all, or substantially all, of the Claims of the Plan Classes affected by the Channeling Injunctions." Conf. Order, p. 22, ¶ 43.

One would expect that if Schechter was subject to a channeling injunction, there would be a fund available to pay his claim if he can prove it. However, the Defendants argue that Schechter's $10 million claim is barred without giving him a chance to prove his case and without giving him any payment (save the refund of the price for one bottle of product). The result for Schechter (no suit and no money) advocated by the Defendants is so at odds with the District Court's finding that the Plan provides payment for all claims affected by the channeling injunction, that it leads to the conclusion that Schechter's suit is not affected by the channeling injunctions. Rather, Schechter has an administrative expense claim to be paid in full when allowed, *see* Conf. Order, p. 25-26, ¶ 54, and his right to sue non-debtors has been preserved.

### E.    Confirmation Hearing

The sequence of the release language in the Plan demonstrates that the expansion of the release beyond ephedra products during the final stages of the confirmation hearing coincided with the settlement with the ephedra personal injury plaintiffs to change their votes to accept the plan. This combined with the Debtor's representation and the District Court's finding that the Third Modified Plan does not adversely impact anyone who has not agreed to the modification, is sufficient for the court to conclude that the modifications do not impair Schechter's right to sue.  But, there is more.

At the same time the confirmation hearings were taking place before the District Court, Schechter's remand motion was argued in the Bankruptcy Court. This court suggested, and all

35

parties apparently agreed, that Schechter's alleged post-petition tort claim was an administrative

expense in accordance with the Supreme Court's decision in *Reading v. Brown*, 391 U.S. 471

(1968).  Indeed, on October 20, 2006, the same day the Debtor asked the District Court to

approve the Third Modified Plan, Chinery's lawyer wrote to the Bankruptcy Court:

> After the Court invited the parties to comment on *Reading v. Brown*, 391 U.S. 471 (1968), all parties agreed that pursuant to that case, Plaintiff's claim (as a post-petition, pre-confirmation claim) may qualify as an administrative claim, if and to the extent allowed.

Dist. Ct. Docket No. 3:06-cv-01726-GEB, Doc. 16, Oct. 20, 2006.

The following Friday, October 27, 2006, the Bankruptcy Court rendered an oral decision

granting Schechter's motion to remand to state court.  That same day, Schechter's lawyer wrote

to the District Court:

> Judge Lyons stated as part of his ruling that his ruling should not delay confirmation of the plan, but that the Schechter claim would have to be dealt with as a component of the bankruptcy plan. He did not state how this was to take place, but directed my office to take this issue up with Your Honor on the hearing for the bankruptcy plan, which has now been carried to Tuesday, October 31st at 1:00 P.M. . . . I am writing to put your Honor on notice of the fact that, due to Judge Lyons' ruling, there now appears to be an issue in connection with the bankruptcy plan that did not previously exist. Accordingly, as Judge Lyons has classified Mr. Schechter's claim as an administrative expense claim, and the law required that this claim either be paid in cash or estimated, and Judge Lyons has left it to your discretion as to how this matter be dealt with, I would respectfully request that this matter be discussed at the continuation of the confirmation hearing.

Dist. Ct. Docket No. 3:06-cv-00202-GEB, Doc. 266, Oct. 27, 2006.

The next Tuesday, October 31, 2006, the District Court reconvened and concluded the

confirmation hearing as an uncontested matter (all objections having been withdrawn and sufficient rejecting votes having been changed to acceptances that all impaired classes accepted the Plan). The Schechter issue was raised by the District Court with the question: "We have to estimate it for the purpose of this hearing, do we not?" Conf. Hr'g Tr. 10:14-15, Dist. Ct. Docket No. 03-cv-5869-GEB, Doc. 701, Oct. 30, 2006. Debtor's counsel argued that Schechter's administrative claim could be dealt with post-confirmation as a contested matter. *Id.* at 11:9 to 12:6. "This is a post-petition claim. The administrative claim hasn't been made yet so we don't know how to react to it. The plan provides for how its' to be handled and Your Honor has jurisdiction to do so." *Id.* at 14:21-24. The Court commented on Schechter's case: "Well, it's -- at the present posture, it's to be referred to the Superior Court subject to the appeal which the debtor has and **it's to be treated as an administrative expense.** I don't know if there's anything I can do right now." *Id.* at 13:11-15 (emphasis added). The court continued on stating: "I don't see that I need to do anything right now. I will deal with the appeal when I comes before me. I'll deal with any further applications when they come before me. But at this juncture, I don't see that this really is something I need to consider to determine confirmation." *Id.* at 16:6-11.

Schechter's claim is treated under the Plan – it is an administrative expense entitled to payment in full under 11 U.S.C. § 1129(a)(9) and Section 3.2 of the Plan. *See Reading v. Brown*, 391 U.S. 471 (1986). Schechter filed a timely administrative claim to which the Debtor has objected. However, it is highly doubtful that the Debtor has any liability since Schechter purchased the Xendrine EFX in February 2004, nine months after the Debtor sold that business in May 2003. The label has an expiration date of July 2005 and Chinery says that would suggest

manufacturing in July 2003, after the Asset Sale, because the product ordinarily carried a two-year expiration. *See* Dist. Ct. Docket No. 3:06-cv-01726-GEB, Doc. 16, Oct. 20, 2006. There are several other Defendants whose liability, if any, is likely to be primary – notably Wood Lane Family Pharmacy, the retailer, and whichever Defendant was the manufacturer.  The Debtor's objection to Schechter's administrative proof of claim can best be resolved by remanding Schechter's suit to state court for determination along with Schechter's claims against the non-debtor Defendants.  The Debtor denies that it has any liability to Schechter, but if the state court determines otherwise, the Debtor will have to pay Schechter in full as an administrative claim. Such claim, being provided for in the Plan, is excepted from discharge under 11 U.S.C. § 1141(d)(1).

## IV.    CONSTRUCTIVE TRUST

Schechter asserts intentional interference with a property right as another ground for relief. *See Schechter* First Am. Compl., Ninth Count. Schechter argues a constructive trust was established for the benefit of Xenadrine EFX victims and alleges that trust was invaded and depleted by the Defendants. *Id.* at ¶ 4. However, the Defendants argue the issue of a constructive trust was previously disposed of by the dismissal of the Unsecured Creditors Committee's adversary proceeding.[21] That adversary proceeding was based on allegations of a fraudulent asset transfer by Nutraquest, and an assertion that the imposition of a constructive trust for the benefit

---

[21] The complaint for *Official Committee of Unsecured Creditors of Nutraquest, Inc. v. Chinery*, was filed in the Bankruptcy Court on January 12, 2005. *See* Bankr. Ct. Docket No. 05-01043-RTL, Doc. 1, Jan. 12, 2005. The Committee then filed a Motion to Withdraw Reference with the District Court on January 19, 2005. *See* Dist. Ct. Docket No. 03:05-cv-00344-GEB, Doc. 1, Jan. 19, 2005. This motion was granted on January 22, 2005, *see* Dist. Ct. Docket No. 03:05-cv-00344-GEB, Doc. 5, Jan. 22, 2005, and the matter proceeded in front of the District Court.

of the unsecured creditors was the proper remedy. Based on the language found in the Plan, the Confirmation Order, and other documents, the argument made by the Defendants is valid; therefore, summary judgment should be granted on this count as to assets now or previously owned by the Debtor.

Schechter argues the Defendants "knew or should have known that members of the general public would be injured by the consumption of Xenadrine EFX." *Schechter* First Am. Compl., Ninth Count, at ¶ 2. Based on this knowledge, Schechter claims the "assets of these defendants became a constructive trust for consumers injured . . . by the consumption of Xenadrine EFX." *Id.* at ¶ 3. Schechter agues the Defendants invaded, depleted and/or misappropriated these funds, thereby interfering with Schechter's property rights as a Xenadrine EFX victim. *Id.* at ¶ 6. At oral arguments on the motions to dismiss, Schechter's counsel conceded the sole focus of this count of the complaint is the May 2003 Asset Sale.

The Committee's complaint in the adversary proceeding, instituted on January 2005 on a derivative basis, alleges several counts against multiple Defendants stemming from the Asset Sale engaged in by Nutraquest, including actual fraud (Second Count), constructive fraud (Third Count), fraudulent transfers (Fourth Count), and conversion (Sixth Count). *See Official Comm. of Unsecured Creditors for Nutraquest v. Chinery*, District Court Docket No. 03:05-cv-00344-GEB, Doc. 2, Jan. 20, 2005. The Eighteenth Count demands the imposition of a constructive trust as an equitable remedy. The Committee argued the property of Nutraquest was wrongfully transferred to the Defendants and that based on this wrongful transfer the property should "be deemed held in constructive trust for the benefit of the creditors of [Nutraquest's] estate." *See id.* at ¶ 389.

However, when Nutraquest eventually agreed to pay one hundred percent of the unsecured creditors' claims under the Plan, the Committee chose not to pursue the adversary proceeding. The District Court dismissed the suit with prejudice on November 1, 2006. Additionally, the Defendants were released from liability for the claim in several different documents. Section 7.9(a) of the Plan, entitled "Approval of Funding Agreement; Settlement of Claims" provides: "[T]he debtor has agreed to waive and release all actual, threatened or potential claims . . . which it ever had, now has or may have against the Plan Funders and other Released Persons . . . including the claims asserted or which could have been asserted in the Committee Adversary Proceeding." Third Mod. Plan, Sec. 7.9(a), p. 19. The Confirmation Order also includes releases encompassing the constructive trust claim, such as: "[T]he Covered Persons are released from any and all Claims or liabilities . . . taking place on or before the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the Plan, including any claims of equitable subordination and similar assertions." Conf. Order, p. 40, ¶ 96(a).[22]

Schechter's argument for intentional interference with a property right is virtually identical to the constructive trust argument made by the Committee. Both are premised on fraud/misappropriation of the Debtor's assets by the Defendants, and both seek a constructive trust as a remedy for this wrong. Since Schechter is making the same basic argument as the Committee, and that argument was previously dismissed with prejudice by the court and released by the debtor in possession, Schechter is barred from recovering on this basis.[23] His right to do

---

[22] Releases of liability also appear in Ephedra PI Settlement Agreement (Ephedra PI Settlement Agreement, ¶ 4) and the Funding Agreement (Funding Agreement, ¶ 9.2).

[23] Generally, upon filing bankruptcy the rights of all creditors to pursue avoidance actions are vested in the trustee or debtor in possession as a fiduciary. *See Pepper v. Litton*, 308 U.S. 295, 307 (1939) ("While normally that fiduciary obligation is enforceable directly by the

so was released upon confirmation of the Plan. Therefore, summary judgment should be granted

in so far as Schechter seeks a constructive trust in assets now or previously owned by the Debtor.

## V.     GROUNDS FOR DISMISSAL UNDER STATE LAW

Schechter also asserts several other grounds for recover that the Defendants have moved

to dismiss. Defendants moved to dismiss the Second, Third, and Fourth Counts of Schechter's

Complaint (for fraud, negligent misrepresentation, and violations of the New Jersey Consumer

Fraud Act, respectively) based on Schechter's failure to plead fraud with particularity. The

alleged grounds for dismissal of the Fifth Count for assault and battery is failure to state a claim

upon which relief can be granted. The Defendants moved to dismiss the Sixth Count for general

negligence based on failure to set forth a factual basis. The Defendants moved to dismiss the

Tenth Count for *per quod* damages asserting that Schechter's parents are not eligible to recover

under New Jersey law since Schechter was not a minor at the time of the injury.

The above causes of action are all governed by state law and are thus more properly

---

corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the
corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for
the protection of the entire community of interests in the corporation–creditors as well as
stockholders."). *See also John L. Motley Assocs., Inc. v. Rumbaugh*, 104 B.R. 683, 687 (E.D. Pa.
1989) ("When a corporation goes into bankruptcy, all corporate causes of action pass to the
bankrupt estate and are enforceable only by the trustee in bankruptcy."); *In re Elsinore Shore
Assocs.*, 91 B.R. 238, 264 (Bankr. D.N.J. 1988) (citing aforementioned language in *Pepper v.
Litton*). Thus, independent creditors do not have standing to pursue such claims even if state law
provides them with the right to do so. However, a creditors' committee may be granted authority
to prosecute an avoidance claim on a derivative basis in certain circumstances, such as when the
debtor in possession unreasonably refuses to do so. *See Official Comm. of Unsecured Creditors
of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc).
        Here, the Committee was permitted to pursue the action and had exclusive standing to do
so at the time the case was dismissed with prejudice. Therefore, upon the dismissal by the
District Court and release by the debtor in possession, there ceased to exist standing to pursue
the cause of action.

considered by the state court. Therefore, this court declines to decide these issues and recommends they be remanded to the state court for further proceedings.

## VI.   REMAND

Soon after his suit was removed from state to federal court, Mr. Schechter moved to remand back to state court. The District Court referred the remand motion to this court. The Bankruptcy Court granted the remand motion, and the Defendants appealed. While the appeal was pending, the District Court sent the motion back to the Bankruptcy Court for reconsideration in light of the intervening confirmation of the Plan and the Defendants' arguments regarding the *Markowitz* Judgment that had not been raised before the Bankruptcy Court.

On reconsideration, this court denied the Plaintiffs' motion to remand to state court because there were issues regarding the impact of orders and proceeding in the District Court that were better determined in federal court. Specifically, the issues involved whether the Plan and Confirmation Order barred Schechter's suit entirely and whether the *Markowitz* Class Action Judgment barred parts of Schechter's suit. All those issues that relate to orders and proceedings in federal court have been disposed of in this motion to dismiss; therefore, there is no reason to keep this suit in federal court. The Debtor has confirmed a plan and should be poised to exit bankruptcy. Pursuant to the Plan and the *Bankruptcy Code*, Section 1129(a)(9)(A), if Schechter has a valid claim against the Debtor, the Debtor must pay it in full. Schechter's claim against the non-debtor Defendants is not impacted by any of the proceedings heretofore in federal court. This court has previously ruled that there is no federal jurisdiction regarding Schechter's claims against the non-debtor Defendants. Schechter's claims arise exclusively under state law.  He should be able to proceed in the forum he selected. *See Stoe v. Flaherty*, 436 F.3d 209 (3d Cir.

2006). This court's order denying the remand motion after reconsideration shall be vacated. The prior order granting Plaintiff's motion to remand should be reinstated.

## **<u>CONCLUSION</u>**

Summary judgment is only proper when it can be shown that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c). Defendants assert Schechter's personal injury claims from ingestion of a non-ephedra product are barred by the release in the confirmed Plan. The Plan and Confirmation Order do not bar Schechter's claims because the last-minute modification of the Plan concerning the Ephedra PI Settlement was not meant to release Schechter's claims. The broad release language inserted in these documents at the eleventh hour was the result of a compromise among the parties to the Ephedra Settlement, not including Schechter. Likewise, the *Markowitz* Judgment does not bar Schechter's claims relating to advertising and consumer fraud because the language of the complaint makes clear the class action was never intended to resolve personal injury claims such as Schechter's. However, the issue of the existence of a constructive trust of the Debtor's assets was previous dismissed with prejudice by the District Court. Therefore, Schechter may not argue this cause of action, as it has been resolved.

Schechter's claims are not barred by either the Plan and Confirmation Order or *Markowitz* Judgment. It is recommended that summary judgment be denied on these bases. However, summary judgment should be granted as to the constructive trust claim as it relates to the Debtor's assets. The remaining causes of action should be remanded to state court for further proceedings.

Dated: November 2, 2007                                  **/S/Raymond T. Lyons**
                                                         United States Bankruptcy Judge

# APPENDIX

**DISTRICT COURT DOCKETS**

### No. 03:06-cv-00202-GEB

| | |
|---|---|
| Doc. 8, Feb. 17, 2006 | Debtor's Plan of Reorganization |
| Doc. 21-2, Apr. 26, 2006 | First Modified Plan |
| Doc. 74, June 1, 2006 | Second Modified Plan |
| Doc. 75, June 1, 2006 | Disclosure Statement for Second Modified Plan |
| Doc. 256, Oct. 20, 2006 | Application for Approval of Modifications to Second Modified Plan |
| Doc. 260, Oct. 24, 2006 | Third Modified Plan |
| Doc. 260-2, Oct. 24, 2006 | Ephedra PI Settlement Agreement |
| Doc. 265, Oct. 27, 2006 | Order Approving Modification to Debtor's Second Modified Plan |
| Doc. 266, Oct. 27, 2006 | Letter from Joseph DiRienzo (Schechter's Counsel) |
| Doc. 278, Nov. 3, 2006 | Confirmation Order |

### No. 03:06-cv-1726-GEB

| | |
|---|---|
| Doc. 7, July 24, 2006 | Nutraquest's Brief in Opposition to Motion to Remand to NJ Superior Court |
| Doc. 16, Oct. 20, 2006 | Letter from Brian McMahon (Chinery's Lawyer) |

45

Doc. 37-2, June 6, 2007      First Amended Complaint, *Schechter v. Cytodyne Technologies, LLC*

**No. 03:05-cv-00344-GEB**

Doc. 1, Jan. 19, 2005      Motion to Withdraw Reference

Doc. 2, Jan. 20, 2005      Complaint, *Official Committee of Unsecured Creditors of Nutraquest, Inc. v. Chinery*

Doc. 5, Jan. 22, 2005      Order Granting Motion to Withdraw Reference

**No. 3:04-cv-00384-GEB**

Doc. 43, May 19, 2006      Third Amended Complaint, *Markowitz v. Cytodyne Technologies, LLC*

Doc. 63, Oct. 12, 2006      *Markowitz* Judgment

**No. 03-cv-5869-GEB**

Doc. 701, Oct. 30, 2006      Transcript of Confirmation Hearing

**BANKRUPTCY COURT DOCKETS**

**No. 03-44147-RTL**

Doc. 16, Oct. 22, 2003      Verified Application for Order Authorizing Debtor to Pay Prepetition Wages

Doc. 60, Dec. 3, 2003      Debtor's Verified Complaint for Declaratory and Injunctive Relief

Doc. 90, Dec. 17, 2003      Nutraquest Monthly Operating Report for November 2003

Doc. 1271, Nov.3, 2006      Transcript of Hearing on Motion to

|  | Remand |
| Doc. 1297, Dec. 1, 2006 | Nutraquest Monthly Operating Report for October 2006 |

**No. 03-2980-RTL**

| Doc. 1-4, at p. 5-22, Dec. 24, 2003 | Complaint, *Markowitz v. Cytodyne Technologies, LLC* |
| Doc. 1-4, at p. 23-35, Dec. 24, 2003 | First Amended Complaint, *Markowitz v. Cytodyne Technologies, LLC* |
| Doc. 1-4, at p. 48-68, Dec. 24, 2003 | Second Amended Complaint, *Markowitz v. Cytodyne Technologies, LLC* |

**No. 05-01043-RTL**

| Doc. 1, Jan. 12, 2005 | Complaint, *Official Committee of Unsecured Creditors of Nutraquest, Inc. v. Chinery* |

47